

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 14, 2025

**VIA ECF**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Ronnell Gurley* 25 Cr. 44 (JGK)

Dear Judge Koeltl:

    The defendant in this case, Ronnell Gurley, is scheduled to be sentenced on June 25, 2025, having pled guilty to participating in a cocaine trafficking conspiracy, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B); and possession of a firearm, in violation of Title 18 United States Code, Section 922(g)(1). For the reasons explained below, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G.") or (the "Guidelines") range of 60 to 71 months' imprisonment is warranted in this case.

    I.    **Offense Conduct and Procedural History**

    Over the course of six undercover transactions, Gurley sold several firearms and approximately 700 grams of cocaine to a confidential information (the "CI"). (Presentence Investigation Report ("PSR") ¶ 10).

August 1, 2023 Video Calls to Gurley

    On August 1, 2023, the CI placed two video calls to Gurley. During the first call, Gurley displayed sealed and stamped packages containing apparent cocaine. Gurley boasted that the packages had come straight from the "cartel" and were, in essence, tamper-proof, so that the CI could be sure of their purity. (PSR ¶ 13). Later during the same call, the CI asked Gurley about "hammers," "pocket rockets," and "street sweepers"—all terms for firearms—that the CI's friend allegedly needed after "the home team had a little mishap" and needed to "hold . . . the fort down." The CI added that he would let his would-be purchasers know that Gurley was "a one stop shop," that is, a single source for guns and drugs. Gurley replied, "that's a fact." (PSR ¶ 14).

    During the second video call placed on August 1, 2023, the CI followed up on his request for firearms. Gurley displayed a firearm with a blue beam and informed the CI that he had one "clip" for him. Gurley clarified that "the other one" had two clips, prompting the CI to respond that he wanted both, which is to say, both firearms. (PSR ¶ 15).

### August 3, 2023 Transaction (Gun and Drugs)

On August 3, 2023, inside an apartment located on Williams Avenue in Brooklyn, NY (the "Brooklyn Apartment"), the CI purchased from Gurley a SCCY 9-mm pistol and one magazine, as well as 100 grams of cocaine. (PSR ¶ 16).  When the CI inquired about another woman present in the Brooklyn Apartment ("CC-1"), Gurley assured the CI, "she straight. She know all about this, man. She, she selling these drinks."  Drinks is a term to for firearms being bought and sold illegally. (PSR ¶ 17).   After completing the transaction, Gurley accompanied the CI downstairs and outside of the Brooklyn Apartment. Once outside, while the CI proceeded to the CI's car, Gurley approached a male ("CC-2") in the vicinity of a black Lexus.  CC-2 then approached the CI and the two discussed the possibility of meeting elsewhere for the next transaction. The CI remarked to CC-2 that the CI and Gurley were about to start "big business."  CC-2 assured the CI that he did not want anyone cutting the CI out of the business. (PSR ¶19).

### August 15 2023 Transaction (Guns and Drugs)

On August 15, 2023, the CI purchased from Gurley and another individual ("CC-3") a Beretta Cx4 Storm rifle and a Ruger .380 pistol, as well as approximately 200 grams of cocaine. During the transaction, the CI asked Gurley about purchasing more narcotics for the CI's associates.  Gurley replied, "whatever ni**as wanna grab."  (PSR ¶ 23).

### August 30, 2023 Transaction (Guns)

On August 30, 2023, inside an East Harlem apartment (the "East Harlem Apartment"), the CI purchased from Gurley a Century Arms 9-mm pistol and a Glock 44 pistol, as well as three magazines.  Also present in the apartment were CC-3 and another individual ("CC-4").  (PSR ¶ 25).  Following the transaction, the CI exited the East Harlem Apartment with Gurley and CC-3, both of whom walked the CI to the CI's car. Outside the CI's car, Gurley admonished the CI not to "come here with they money and try to get them deals," referring to the associates for whom the CI was purportedly purchasing guns and narcotics. (PS R ¶ 27).

### September 28, 2023 Transaction

On September 28, 2023, outside the East Harlem Apartment, the CI paid Gurley $4,800 for 200 grams of cocaine. During the transaction, the CI offered to make an introduction for Gurley's "older cousin," so he "could meet ni**as and sell these ni**as some bricks," a reference to kilograms of drugs. (PSR  29).  At the same time, the CI warned that there could not be "all this cut in it," explaining that the "first sh*t" was "good" but "a little weak." In short, the CI was lamenting the quality of the narcotics he had purchased from Gurley during previous transactions. Gurley went on to defend his supply, explaining, "When ni**as is serious, when you be like aight, yo, ni**as wanna fire right now, then... ni**as will see wassup. Other than that, bro ... All I hear is talk, talk, talk. Sh*t is around." A few minutes later, while still with the CI, Gurley called his "cousin" to assure the CI that the CI would get his money's worth. On speakerphone, Gurley asked his "cousin" to confirm that the cousin was not going to "play with ni**as' bag" if "ni**as come for five, six." The "cousin" provided assurances, after which Gurley explained that he "just wanted

somebody to hear that, so ni**a know, like, any bag coming for this size is Al. ... Your money is good here." (PSR ¶ 30).

### September 10, 2024 Transaction

On September 10, 2024, near Dalny Road in Queens, the CI bought 100 grams of cocaine from Gurley. (PSR ¶ 32). Following the sale, the CI and Gurley agreed that the CI would follow Gurley's car in the CI's own car to retrieve a firearm for the CI to purchase. Accordingly, the CI followed Gurley who first stopped in Bedford-Stuyvesant, Brooklyn, where Gurley picked up an individual ("CC-5"). From there, the CI followed Gurley to Fort Greene, Brooklyn, where CC-5 exited Gurley's car and entered a residential building. CC-5 emerged from the building a short while later and handed a silver Taurus 9-mm pistol to Gurley, who, in turn sold that pistol to the CI. (PSR ¶ 33).

### December 4, 2024 Transaction and Arrest

On December 4, 2024, Gurley sold approximately 100 grams of cocaine to the CI. The following day, Gurley was arrested on a complaint charging him with firearms trafficking conspiracy (Count One), firearms trafficking (Count Two), conspiracy to distribute controlled substances (Count Three), and use of a firearm in connection with the drug trafficking crime charged in Count Three (Count Four). *See* 24 MAG 4198.

On February 5, 2025, Gurley appeared before this Court and pled guilty to a two-count Information, pursuant to a plea agreement (the "Plea Agreement") stipulating a Guidelines range of 57 to 71 months' imprisonment, with a mandatory minimum term of 60 months' incarceration, based on an offense level of 23 and a criminal history category of III.

Consistent with the plea agreement, the final PSR calculates an applicable Guidelines range of 60 to 71 months' imprisonment (the "Guidelines Range"), based on an offense level of 23 and a criminal history category of III. (PSR ¶ 92). Probation recommends a sentence of 60 months' noting that Gurley's criminal conduct was "not a single lapse in judgment" and was exacerbated by the fact that Gurley "was aware that he was selling firearms to a felon and those firearms were likely to be used to commit additional crimes. (PSR at 29). For the reasons discussed below, the Government believes that a sentence within the Guidelines Range is appropriate in this case.

## II. Discussion

### 1. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7).  *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>  (B) to afford adequate deterrence to criminal conduct;
>
>  (C) to protect the public from further crimes of the defendant;
>
>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Sentence within the Guidelines Range Is Sufficient and Not Greater Than Necessary

A sentence of incarceration within the Guidelines Range is consistent with the Section 3553(a) factors. The nature and circumstances of the offense, as well as the history and characteristics of the defendant support such a sentence.  So do the legitimate aims of sentencing, specifically, the need for a sentence to reflect the seriousness of the offense, provide just punishment, and promote respect for the law; the need to protect the public; and the need to individually deter this defendant.

*First*, a sentence within the Guidelines Range adequately reflects the seriousness of the instant offense and is necessary to provide just punishment and protect the public.  The defendant committed an unquestionably dangerous offense.  Over and over again, he sold guns and drugs throughout New York City. Gurley may have been a hobbyist with a "love of guns." (Gurley Sent. Mem. At 5).  But he was also a drug dealer.  And he sold both guns and drugs, well-aware that they could end up in the hands of convicted felons[1] and dangerous criminals.

This Court is well-familiar with the risk inherent in dealing addictive drugs, the risk inherent in gun possession, and the amplified risk when a defendant engages in those activities

---

[1] The CI reminded Gurley at least twice of the CI's own criminal record. On September 10, 2024, for example, the CI told Gurley that the CI had "three felonies," while Gurley had but one. (PSR ¶ 33, n.1).

together. It takes little imagination to conceive of the grave harm the defendant could have inflicted, had the CI not been working for law enforcement. Had the CI been a bona fide criminal purchaser who transferred Gurley's small arsenal to the "home team" that "had a little mishap" and "needed to hold... the fort down" (PSR ¶ 14) or to the CI's friends in "Albany." (PSR ¶ 23).

*Second*, Gurley's history and characteristics warrant a sentence within the Guidelines Range. Gurley experienced an undeniably difficult upbringing. He fell victim to gun violence at a young age. He has lost loved ones to violence, illness, and incarceration. His parents were arrested for narcotics trafficking, and he lacked "good examples." (Ex. A). At the same time, Gurley describes a loving and supportive family. And he appears to have demonstrated minimal effort to emerge from the poverty and violence that marked his upbringing. He recounts pressure to assist his family but has remained unemployed since 2023. (PSR ¶ 77). He states that selling drugs was "the only way I knew how to make money to support my family" (Ex. A at 1), altogether discounting his GED (PSR ¶ 78) and foray into small business (PSR ¶ 83).

*Third*, a sentence within the Guidelines Range is necessary to specifically deter the defendant and promote respect for the law. The CI was *not* Gurley's introduction into the world of guns and drugs. Twice before his arrest in December 2024, Gurley had been arrested for dealing drugs, including crack and heroin. (PSR ¶ 56-57). The first of those arrests also involved a loaded a firearm. (*Id.* ¶ 57). Yet Gurley was undeterred by serving nearly a year in jail for those arrests. Rather than course correct and devote his energy to finding steady employment, Gurley sought criminal shortcuts—selling guns and/or drugs not once, but *six* times to the CI. A Guidelines sentence is necessary to make clear to Gurley the cost of opting for criminal shortcuts.

### III.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines Range of 60 to 71 months' imprisonment.

Very truly yours,

JAY CLAYTON
United States Attorney

by: _____
Marguerite B. Colson
Assistant United States Attorney
(212) 637-2587